# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARLA FLETCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV380 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Marla Fletcher, has brought this action to obtain review of a final decision of the Commissioner of Social Security denying her claims for social security disability benefits. The Court has before it the certified administrative record and cross-motions for judgment.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on October 28, 2010, alleging a disability onset date of December 15, 2009, which was later amended to October 18, 2010. (Tr. 15, 37, 160, 244.) The application was denied initially and again upon reconsideration. (Id. at 109-112, 116-119.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Id. at 7.) At the November 20, 2012 hearing were Plaintiff, her attorney, and a vocational expert ("VE"). (Id.

at 34.) On February 11, 2013, the ALJ determined that Plaintiff was not disabled under the Act. (*Id.* at 15-29.) On March 6, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's determination the Commissioner's final decision for purposes of review. (*Id.* at 1-4.)

## II. STANDARD FOR REVIEW

The scope of judicial review of the Commissioner's final decision is specific and narrow. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue before the Court, therefore, is not whether Plaintiff is disabled but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *Id.*

## III. THE ALJ'S DISCUSSION

The ALJ followed the well-established five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth in 20 C.F.R. §§ 404.1520. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). Here, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since her amended onset date of October 18, 2010. (Tr. at 17.) The ALJ next found that Plaintiff had the following severe

impairments: degenerative joint disease of the lumbar spine; degenerative joint disease of the bilateral knees; depression; post-traumatic stress disorder; and panic disorder. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1. (*Id.* at 19.) The ALJ reached the fourth step of the sequence, at which point she determined that Plaintiff could return to her past relevant work as a ticketer as it is actually and generally performed. (*Id.* at 27.) The ALJ made alternative step five findings and concluded that given Plaintiff's age, education, work experience, and RFC, there were other jobs that Plaintiff could perform, such as industrial cleaner, laundry checker, and a self-service laundromat attendant. (*Id.* at 28.) Consequently, the ALJ determined that Plaintiff was not disabled from the amended alleged onset date (October 18, 2010) through the date of the decision (February 11, 2013.). (*Id.* at 28.)

Prior to step four, the ALJ determined Plaintiff's RFC based on an evaluation of the evidence, including Plaintiff's testimony and the findings of treating and examining health care providers. (*Id.* at 22-26.) Based on the evidence as a whole, the ALJ determined that Plaintiff retained the RFC to perform a limited range of medium work. (*Id.* at 22.) Specifically, the ALJ concluded that Plaintiff could perform medium work, except that she (1) could frequently climb, kneel, and crawl, and she could occasionally stoop and crouch; (2) must avoid concentrated exposure to hazardous conditions; (3) had the mental RFC to perform simple, routine tasks, follow simple, short instructions; make simple, work-related decisions; and adapt to a few workplace changes; (4) could perform work at a fixed production rate or pace; and (5) could have only occasional interaction with the general public. (*Id.*)

3

## IV. ANALYSIS

Plaintiff makes three arguments. First, Plaintiff contends that the ALJ failed to point to substantial evidence in support of her RFC findings. (Docket Entry 10 at 3.) Second, she contends that substantial evidence does not support the ALJ's decision at step three that she does not meet the requirements of Listing 1.02A. (*Id.*) Third, Plaintiff contends that the ALJ violated Social Security Rulings 96-8p and 96-9p with respect to her ability to ambulate. (*Id.*) For the following reasons, the undersigned concludes that remand is in order.

### A. The ALJ's RFC Determination Is Not Supported By Substantial Evidence.

Plaintiff contends that the ALJ failed to point to substantial evidence in support of her RFC findings. (Docket Entry 10 at 4-10.) The ALJ is charged with the ultimate responsibility to determine a claimant's RFC. 20 C.F.R. §§ 404.1546(c); 404.1545(a)(3); 404.1527(e)(2). The RFC is based on all of the relevant evidence, including medical records, medical source opinions, daily activities, and subjective allegations and descriptions of limitations. 20 C.F.R. § 404.1545; S.S.R. 96-8p, 1996 WL 374184, at *5.

Here, the ALJ concluded that Plaintiff could perform a limited range of medium work. (Tr. 22.) Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" and requires an individual to be on her feet for up to six hours during an eight-hour workday. 20 C.F.R. § 404.1567(b)-(c); SSR 83-10, 1983 WL 31251, at *5. "Occasionally" is defined as up to 1/3 of a workday, while "frequently" is defined as 1/3 to 2/3 of a workday. SSR 83-10, 1983 WL 31251, at *5-6. To understand why the ALJ has not pointed to substantial evidence in support of her RFC

4

finding, a discussion of the pertinent medical evidence, and the ALJ's evaluation of it, is first in order.

### i. Dr. Morgan

On September 3, 2010, roughly six-weeks prior to the amended onset date of October 18, 2010, Plaintiff visited her primary care physician, Dr. Ken Morgan with complaints of right knee pain. (Tr. 256.) Plaintiff noted that her pain had been on and off for the past six to seven years, but complained that it had gotten worse over the last couple of weeks. (*Id.*) Plaintiff had no pain with gentle extension flexion and no instability to stress testing. (*Id.*) Manipulation of the knee caused sudden sharp pain with certain movements, but resolved in a second or two. (*Id.*) Dr. Morgan concluded that these symptoms were consistent with a probable degenerative tear of the meniscal cartilage in the right knee, referred Plaintiff to an orthopedist, and prescribed Ibuprofen 800 mg. (*Id.*) "[I]n the meantime, [Dr. Morgan's notes] advised careful activities us[ing] crutches or the walker she has with her this morning" and "in [the] meantime avoid walking on uneven ground where she could stumble or twist her knee." (*Id.*) In December 2010, Dr. Morgan advised that if Plaintiff later needed stronger medication, she could go to the pain clinic. (*Id.* at 364.)

The ALJ did not attribute any particular weight to Dr. Morgan's opinions, though she did discuss them. (Tr. 18, 23 *referencing* 42, 364.) The ALJ accurately noted that Dr. Morgan offered to make Plaintiff an appointment at a pain clinic to manage her pain, and that at her administrative hearing Plaintiff testified that she had not received treatment for her knee since

5

late 2011[1] and testified further that she only took Ibuprofen. (*Id.*)

  ii. **Dr. Veneziano**

On October 18, 2010, roughly six weeks after she met with Dr. Morgan, Plaintiff saw an orthopedist, Dr. Joseph A. Veneziano, Jr., for her complaints of right knee pain. (Tr. 251.) Dr. Veneziano noted that Plaintiff sought a second opinion because a different doctor, Dr. Taft, had recommended a total knee replacement. (*Id.*) Dr. Veneziano also noted that Plaintiff ambulated with a walker, and that she reported occasional locking with increased pain. (*Id.*) Her x-ray showed severe osteoarthritis in all three compartments and "bone-on-bone arthritis," and Dr. Veneziano—who acknowledged that Plaintiff may have had a meniscus tear—told Plaintiff that her only surgical option would most likely be a total knee replacement. (*Id.*) Plaintiff was described as having post traumatic stress disorder and thus as being leery of this procedure, but Dr. Veneziano noted that an arthroscopy might also be an option if she did not want a total knee replacement. (*Id.*) Dr. Veneziano also noted that she had received an "injection" recently, and that he consequently could not provide her with another injection that day, but could in several months. (*Id.*)

The ALJ did not attribute any particular weight to Dr. Veneziano's opinions, although she did discuss them essentially as set forth above. (Tr. 17, 23.) The ALJ also specifically noted that Dr. Veneziano told Plaintiff that she could return for shots in an effort to control her pain. (Tr. 17-18, 23 *referencing* 251.) Again, however, the ALJ accurately noted that Plaintiff testified at her hearing that she had not received treatment for her knee since late

---

[1] The ALJ erroneously stated "late 2011" in her decision (Tr. 23), but later correctly states "late 2010" (Tr. 25, 26).

6

2011[2] and that she only took Ibuprofen for her knee pain. (Tr. 23 *referencing* Tr. 42.) The ALJ further pointed to an entry written by her social worker and therapist the day after Plaintiff saw Dr. Veneziano in which Plaintiff reports that she planned "to hold off replacement as long as she can stand it since another round would be needed in her lifetime." (Tr. 23 *referencing* Tr. 322.)

### iii. Dr. Setty

On April 26, 2011, about six months after meeting with Dr. Veneziano, Dr. Janakiram Setty conducted a consultative examination of Plaintiff. (Tr. 277.) Plaintiff told Dr. Setty that she uses a walker most of the time, beginning in August 2010. (*Id.*) Plaintiff also stated that she sometimes uses a cane, especially if her back hurt. (*Id.*) Upon examination, Dr. Setty noted that Plaintiff walked without assistance, with a wide-based gait, but that she drug her feet slightly. (*Id.* at 278.) Dr. Setty's notes state that Plaintiff brought a walker with her and used the walker in the hallway (*id.*), but later also indicated that Plaintiff did not use a walker when walking in the hallway, but brought one with her, (*id.* at 279). However, in any event, Dr. Setty indicated that Plaintiff used the walker when she left the office. (*Id.* at 279.) Dr. Setty diagnosed Plaintiff with (1) degenerative joint disease of the lumbar spine, (2) degenerative joint disease bilateral knees, (3) Type 2 diabetes, non-insulin-dependent, (4) hypertension, moderately severe, (5) morbid obesity, (6) chronic depression, and (7) PTSD with severe anxiety. (*Id.* at 280.) Dr. Setty concluded that that Plaintiff could stand for four hours and "maybe" walk for four hours, and noted that Plaintiff "might" need a walker or cane and that a walker would "probably" be beneficial for distance and uneven terrain. (*Id.*) Dr.

---

[2] Again, the ALJ stated "late 2011" in her decision (Tr. 23), but later correctly states 2010 (Tr. 25, 26.)

7

Setty found that Plaintiff could lift/carry ten pounds occasionally and frequently, climb one flight of stairs and perform occasional stooping, with no balancing, crouching, or crawling. (*Id.* at 280-81.) He also found that she should not work at heights or around heavy machinery. (*Id.* at 281.)

The ALJ also described Dr. Setty's medical opinion, largely as described above. (Tr. 25.) However, she attributed Dr. Setty's opinion "little weight." (*Id.*) In support of her decision to afford Dr. Setty's opinion little weight, the ALJ stated that Dr. Setty's opinion is not supported by other evidence in the record or by Dr. Setty's own reported observations. (*Id.*) Furthermore, the ALJ accurately pointed out that claimant had not received treatment for her back or knees since late 2010 and that she only used Ibuprofen for pain relief. (Tr. 25 *referencing* 42, 364.) The ALJ also characterized Dr. Setty's report as concluding that Plaintiff had normal gait and coordination, with no back spasms, normal motor strength and muscle bulk and tone. (Tr. 25 *referencing* 277-81.)

### iv. The State Agency Consultants

Additionally, at Plaintiff's initial level of determination in May 2011, non-examining disability examiner, Mr. Mark Swindell found that Plaintiff could frequently lift and/or carry ten pounds, occasionally lift and/or carry twenty pounds, could stand, walk, and sit for about six hours in an eight hour day; could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; had no limitations on balancing, stooping, kneeling, crouching or crawling; but should avoid concentrated exposure to hazards. (Tr. 85-87.) Upon reconsideration in August 2011, a second non-examining disability examiner, Dr. Jack

8

Drummond, found similar limitations to that of Mr. Swindell, except found further that Plaintiff could frequently kneel or crawl, and could occasionally crouch. (*Id.* at 101-03.)

The ALJ described Dr. Drummond's medical opinion, largely as described above. (Tr. 25.) Like the opinion of Dr. Setty, the ALJ afforded Dr. Drummond's opinion "little weight" as to his conclusion that Plaintiff could only perform light work, because Plaintiff had received no treatment since late 2010 and had testified that she only took Ibuprofen for pain relief. (*Id. referencing* 42, 364.) However, the ALJ attributed "significant weight" to Plaintiff's postural and environmental limitations, because these limitations were said to be generally supported by other record evidence. (*Id.* at 25.)

v.  **The ALJ's Decision**

In short, the ALJ declined to give the physicians more than little weight regarding their assessment of Plaintiff's proper exertional level. In summary, Plaintiff's treating physician (Dr. Morgan) diagnosed a probable degenerative tear of the meniscal cartilage, prescribed Ibuprofen 800 mg (and offered the services of a pain clinic), advised that she use a walker until she could see an orthopedist, and referred her to an orthopedist. That orthopedist (Dr. Veneziano) concluded that Plaintiff had severe "bone-on-bone" osteoarthritis, a possible meniscus tear, and that she needed a total knee replacement, or perhaps arthroscopy, and concluded further that Plaintiff could receive injections to help with her pain. The examining state agency consultant (Dr. Setty) concluded that Plaintiff could only lift/carry ten pounds and could only stand for four hours and "maybe" walk for four hours, and noted that Plaintiff "might" need a walker or cane and that a walker would "probably" be beneficial for distance

9

and uneven terrain. The non-examining state agency consultants (Dr. Drummond and Mr. Swindell) also concluded that Plaintiff could frequently lift and/or carry ten pounds, occasionally lift and/or carry twenty pounds, and could stand, walk, and sit for six hours in an eight hour day.

Nevertheless, after affording the physicians little weight regarding Plaintiff's proper exertional level, the ALJ concluded in her February 11, 2013 decision that Plaintiff could perform a reduced range of medium work, in large part because Plaintiff testified that she had not received any treatment since late 2010 for her degenerative joint disease and the osteoarthritis in her knees, particularly her right knee. (Tr. 26.) In further support, the ALJ also pointed out that at her administrative hearing, Plaintiff "testified that she went out to eat at Golden Corral, a buffet restaurant, three times in six months. (Hearing Testimony). This demonstrates that the claimant can lift, carry, stand, walk, and balance." (*Id.* at 24 *referencing* Tr. 59.) The ALJ pointed further to a statement Plaintiff made to her social worker and therapist that she had a good Thanksgiving and that she had cooked a turkey for only the second time. (*Id.* at 24 *referencing* Tr. 395.) From this, the ALJ concluded that Plaintiff can "stand, lift, and carry." (*Id.* at 24.)

The ALJ also concluded that "the claimant's reported activities of daily living do not support her allegations of disability." (Tr. 24.) The ALJ made her findings as to Plaintiff's activities of daily living in step three, where she determined that:

> She reported that she performed some household chores, such as light dusting, washing dishes, washing the laundry, sweeping, and trimming flowers. She also reported that she prepared simple meals, such as microwave dinners and some light stovetop items. (Exhibit 6E-3). The claimant also reported that she continued

10

to drive, and that she went shopping in stores and on-line (Exhibit 6E-4).

(*Id.* at 21.) Consequently, it was these activities of daily living that the ALJ took into consideration in determining that Plaintiff could perform medium work.

### vi. Assessment of Plaintiff's Activities of Daily Living

The undersigned is not persuaded that Plaintiff's activities of daily living considered individually or collectively—as articulated by the ALJ—provide substantial evidence for the ability to perform medium work.[3] The undersigned is further concerned that the ALJ may have also failed to consider Plaintiff's asserted activities in their entirety and may have improperly equated those activities with the ability to perform medium level work. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [a claimant] would be by an employer.") (citations omitted). On remand, the ALJ should build a logical bridge between the evidence and her findings that permits the Court to review for substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion").

---

[3] *See, e.g., Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. Jan. 7, 2011) (holding that the plaintiff's ability to go to the grocery store, the pharmacy, and church, prepare her own meals most of the time, dress herself without assistance, and drive for at least thirty minutes per day were "minimal activities [ ] hardly consistent with eight hours' worth of typical work activities"); *Webster v. Colvin*, No. 3:13-CV-497-TAV-HBG, 2014 WL 4095341, at *9 (E.D. Tenn., Aug.19, 2014) ("[T]he Court is not persuaded that the Plaintiff's daily living activities necessarily support an RFC of medium work. The ALJ noted an independence in self-care and an ability to take care of pets, prepare simple meals, perform light household chores, drive, walk, go out alone, shop in stores, manage finances, read for short periods of time, watch TV, and socialize by attending yard sales and family gatherings.").

11

In support of this conclusion, the undersigned notes the following. First, Plaintiff did not testify that "she went out to eat at Golden Corral, a buffet restaurant, three times in six months." Rather, Plaintiff testified that she "maybe" ate out three times in a six month period and she thought that last of these outings was a Golden Corral. (Tr. 59-60.) Nor did Plaintiff state that she served herself at the buffet at Golden Corral, although the ALJ presumed so. (*Id.* at 24, 59-60.) However, even assuming Plaintiff visited Golden Corral three times in six months, and assuming further that she served herself at the buffet, without further explanation from the ALJ, the undersigned still does not understand how the ALJ's finding supports a conclusion that Plaintiff is able to spend up to six hours a day working on her feet and lifting up to twenty-five pounds or spend up to one-third of an eight hour workday lifting up to fifty pounds. Second, and likewise, the undersigned cannot discern why Plaintiff's ability to cook one turkey of an indeterminate weight under indeterminate circumstances during a multi-year period of alleged disability provides substantial evidence for the performance of medium work.

Third, the undersigned reaches the same conclusion at to Plaintiff's ability to perform light dusting, washing dishes and laundry, sweeping, trimming flowers, using the microwave, and light stovetop cooking. The ALJ based these findings on Plaintiff's self-reporting. (Tr. 214-221.) Plaintiff reported that she lives alone in a mobile home and that while she performs "light dusting, wash dishes, laundry, light broom sweeping, [and] trim flowers" "[i]t takes a long time because I have to stop to rest" and that she needs "help with everything due to [her] walker and limited mobility, but [she] has no one to help [her]." (*Id.* at 214, 216.) Plaintiff

12

further reported that her use of the microwave and her light stovetop cooking generally took less than five minutes and that her stovetop cooking and oven cooking were greatly decreased. (*Id.* at 216.) She also reported that she "just can't stand long enough to prepare – [she] sit[s] down." (*Id.* at 221.) The ALJ did not address these qualifications in addressing Plaintiff activities of daily living. In any event, without explanation, it is unclear to the undersigned why Plaintiff's ability to perform these tasks supports the lifting and standing demands required by an RFC for medium work.

Fourth, the ALJ correctly noted that Plaintiff continued to do some driving during her alleged period of disability. (*Id.* at 21, 53, 60-66.) The ALJ found that Plaintiff traveled by car on trips to unnamed destinations in December of 2011, January of 2012, February of 2012; the North Carolina mountains in 2011 and 2012; a trip to Myrtle Beach, South Carolina; and a drive with a friend to "see the leaves." (*Id.* at 24.) These trips were generally taken alone for an hour, though the trip to Myrtle Beach was for four hours. (*Id.*) Plaintiff testified that at Stone Mountain State Park she "sat in [her] car and watched the river" but that she did not go down to the river. (*Id.* at 62.) She testified further that she stayed at cabins in the Blue Ridge Parkway, that they had ramps that were easy to get to, and that while she was there she sat "on the front porch and looked at the scenery." (*Id.* at 62-63.)

Plaintiff also testified that on a trip to the beach she "basically just either lay on the bed and look out at the water and read, or [sat] – if it[ was] warm enough, [sat] on the balcony. [She did not] do any walking" and only left her room to "go through a drive-through." (*Id.* at 66.) Finally, when the ALJ completed her questioning of Plaintiff, Plaintiff asked to clarify a

13

point that she was concerned might mislead the ALJ. (*Id.* at 68.) Specifically, she testified, "Could I add . . . one thing . . . that might be misleading? I'm so sorry. When I drive, I do . . . I have to stop and get out and stretch and rest because I just cannot sit for that long. I've learned to rest and stop." (*Id.* at 68.)

Again, the undersigned does not understand why Plaintiff's ability to take these trips over a multi-year period—most of which involved driving an hour and apparently remaining sedentary upon arrival—would translate to an ability to repeatedly lift twenty-five to fifty pounds for a considerable portion of the day or to stand for most of a work day. Additionally, the ALJ did not address the qualification that Plaintiff added at the end of her testimony that she needed to take breaks during the course of her driving to stretch and rest, nor did the ALJ address Plaintiff's descriptions of her limited activities during the course of those trips.

Fifth, the ALJ also found that Plaintiff went shopping in stores and on-line. (*Id.* at 21.) As an initial matter, while Plaintiff's ability to shop-online may demonstrate an ability to concentrate to some degree, Plaintiff's ability to shop online appears immaterial to her ability to perform the requirements of medium work. As for Plaintiff's ability to shop, the ALJ correctly noted that Plaintiff was able to shop and the Court notes her hearing testimony mostly addressed her ability to grocery shop. (*Id.* at 54, 60.) Plaintiff testified that she went grocery shopping two times a month for thirty minutes at a time. (*Id.* at 54.) She testified that she stood in the checkout line by leaning on the cart. (*Id.* at 55.) She testified that the food she buys "is always higher than lower, and [she] just pull[s] it off and set[s] it down into the cart" and when she got home she would "pull [her] car right up to [her] front porch, and .

14

. . just kind of open the door and just like transfer it as much as I can. I have to rest, and then I get it up on the stoop, and then I get inside my house and recuperate." (*Id.* at 55-56.) *See Cistrunk v. Colvin*, No. 2:12-cv-82-PRC, 2013 WL 1281824, at *14 (N.D. Ind. Mar. 27, 2013) ("Importantly, the ALJ does not discuss Plaintiff's testimony that he structures his activities in accordance with his limitations.") (citing SSR 96–7p at *8 and *Bjornson*, 671 F.3d at 647).)

Without additional explanation, the undersigned is not persuaded that the ability to shop for an hour a month would translate to work at the medium exertional level. And, again, the ALJ did not address in her decision the considerable qualifications described in her ability to shop. For all these reasons, while it was proper for the ALJ to consider the Plaintiff's daily activities in assessing her RFC, the cited activities taken separately and together, as characterization by the ALJ, do not provide substantial evidence that the Plaintiff can perform medium work. *See, e.g., Cavarra v. Astrue*, 393 Fed. App'x 612, 614-15 (11th Cir. 2010) ("[T]hese somewhat minimal daily functions [performing basic household chores, cooking, driving, and church] are not comparable to typical work activities. . . . [T]he ALJ did not explain how the ability to perform basic household chores with difficulty qualified [claimant] to perform medium work[.]") In short, considered individually and collectively, the ALJ failed to point to substantial evidence supporting an RFC for limited medium work.

The undersigned does not find Defendant's arguments to the contrary persuasive. Defendant largely points to the evidence set forth above in support of the ALJ's conclusion that Plaintiff could perform medium work. However, as explained above, the ALJ has yet to point to substantial evidence justifying the RFC determination. Defendant also points to

15

evidence that the ALJ did not mention in her decision. This is problematic because it is the ALJ's duty to making findings of fact in the first instance, not this Court's. Even setting this issue aside, however, the evidence that Defendant points to does not meaningfully further her argument.

For example, Defendant asserts that Plaintiff "did some work on her house, patching the underpinning to keep animals from getting under the house."[4] (Docket Entry 12 at 15 *referencing* Tr. 385.) A review of the document to which Defendant points—a note from Plaintiff's social worker and therapist—does not provide substantial evidence for the conclusion that she can perform medium work. Specifically, the note states that Plaintiff "[d]id get out and do some work on her house despite pain, patching up the underpinning to keep animals from getting in there; very sore today. I had encouraged paying someone to do it, but she said she felt stubborn and wanted to do it herself; *took her a long time but she did it, had to scoot around on the ground due to her knees not holding her up.*" (*Id.* (emphasis added).) It is unclear to the undersigned how the requirements of medium work—standing six hours a day and lifting twenty-five to fifty pounds—are consistent with "scoot[ing] around on the ground" for "a long time" where an individual's knees will "not hold[ ] her up."

The cases Defendant cites on this issue are also inapposite. Unlike this case, the record in *Holloway v. Apfel* contained a medical source statement concluding that the

---

[4] The additional evidence pointed to by Defendant, generally located in Plaintiff's therapy notes, does not alter the conclusions the undersigned reaches herein. (Docket Entry 12 at 7.) For example, Defendant points out that the ALJ found that Plaintiff adopted a cat, which she was able to care for. (*Id.*) However, the undersigned fails to understand how caring for a cat translates to medium work. Defendant also points to a treatment note referencing a drive to St. Louis. (*Id.*) Yet, the ALJ never mentioned this in her decision, perhaps because it is not clear from the treatment note whether this trip took place during the alleged period of disability.

16

claimant—who was found not to be disabled—could perform medium work *and* also contained activities of daily living involving *extensive* driving (of an indeterminate distance) and walking (of an indeterminate distance). 221 F.3d 1338, 1338 (7th Cir. 2000). *Henley v. Astrue* involved a claimant whose daily activities involved raking leaves, fixing cabinets, installing ceiling fans, and home improvements for family and a neighbor, including building a deck. 3:11CV488–FDW–DSC, 2012 WL 2804852, *6 (W.D.N.C. May 9, 2012). Nothing comparable exists on the record here.[5] For all these reasons, remand is proper.

### vii. Assessment of Plaintiff's Ability to Ambulate

The undersigned has an additional concern, in that the ALJ's analysis of Plaintiff's use of a walker is also problematic. Appendix One of the Regulations states that "[t]he requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, Subpt. P, Appendix 1, § 1.00(J)(4). Thus, an ALJ is required to consider the impact of "medically required" hand-held assistive devices. Social Security Ruling 96-9p, 1996 WL 374185, at *7; *see Wimbush v. Astrue*, No. 4:10CV00036, 2011 WL 1743153, at *2–3 (W.D.Va. May 6, 2011). A hand-held assistive device is "medically required" if "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96–9p, 1996 WL 374185, at *7. Moreover, a prescription or the

---

[5] Defendant points to evidence Plaintiff decorated for Christmas (Tr. 395), trimmed flowers (*id.* at 216), and worked on her house by patching her underpinning (*id.* at 385). However, the undersigned has already addressed Plaintiff's patchwork—which she apparently had to perform seated—and nothing in the ALJ's decision or on the record explains the details of Plaintiff's decorating for Christmas or flower trimming.

17

lack of a prescription for an assistive device is not necessarily dispositive of medical necessity. *See Staples v. Astrue*, 329 F. App'x 189, 191-92 (10th Cir. 2009). Thus, under SSR 96-9P, Plaintiff must have presented medical documentation (1) establishing the need for his cane and (2) describing the circumstances for which it is needed. Failing that, an ALJ is not required to include the use of a walker in a plaintiff's RFC.

Plaintiff contends this case should be remanded to determine whether her use of a walker was medically necessary. (Docket Entry 10 at 13.) The Court agrees. The ALJ in this case failed to explicitly address whether Plaintiff's need for a walker was medically necessary and, at most, seems to tacitly reject the notion that it could be.[6]

Here, Dr. Morgan advised that, at least until she could visit a specialist, Plaintiff was limited to "careful activities us[ing] crutches or the walker she has with her this morning" and "in [the] meantime avoid walking on uneven ground where she could stumble or twist her knee." (Tr. at 256.) Dr. Veneziano also noted that Plaintiff ambulated with a walker. (*Id.* at 251.) Dr. Setty noted that Plaintiff "might" need a walker or cane and that a walker would "probably" be beneficial for distance and uneven terrain. (*Id.* at 280.) Plaintiff was further observed using a walker by a consulting psychiatrist, Dr. Surya K. Challa, M.D. (*Id.* at 270.)

In her decision, the ALJ repeatedly mentioned Plaintiff's use of a walker. (*Id.* at 17-20,

---

[6] *See Hamlin v. Colvin*, C/A No. 8:12–3601–RMG–JDA, 2014 WL 587464, at *13-14 (D.S.C. Jan.23, 2014) (ALJ improperly failed to discuss whether Plaintiff's cane was medically necessary when determining the RFC), *adopted*, 2014 WL 588073, at *6 (D.S.C. Feb.14, 2014); *McNair v. Colvin*, No. 8:13–1218–MGL, 2014 WL 2614892, *18 (D.S.C. June 10, 2014) ("Plaintiff has some difficulties ambulating and may, at least at times, require the use of an assist device. [H]owever, that the ALJ rejected outright Plaintiff's claim that she requires the use of a cane merely because it was not prescribed by a doctor, and without any explanation as to how he resolved the conflicting evidence of record regarding Plaintiff's use of the cane, or whether he considered the use of a cane in determining Plaintiff's RFC at all.").

18

25.) However, the ALJ never addressed whether the walker was medically necessary or explicitly reconciled the conflicting evidence on this issue so that this Court can properly review the matter. At a minimum, the ALJ should assess whether the use of the walker (or cane) is medically necessary and to offer reasons supporting that determination.

## V. CONCLUSION

None of this necessarily means that Plaintiff is disabled under the Act—or that the Plaintiff can or cannot perform work at any particular exertional level, including the medium exertional level—and the undersigned expresses no opinion on that matter. Nevertheless, in light of all of the above, the undersigned concludes that the proper course here is to remand this matter for further administrative proceedings. Finally, the undersigned declines consideration of the additional issues raise by Plaintiff at this time. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 763-64 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision as no preclusive effect, as it is vacated and the new hearing is conducted de novo).

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. **IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be **REVERSED**, and that the matter be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g). To this extent, the undersigned **RECOMMENDS** that Defendant's Motion for Judgment on the Pleadings (Docket Entry 11) be **DENIED**, and that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 9) be **GRANTED**. To the

19

Case 1:14-cv-00380-LCB-JLW   Document 13   Filed 07/23/15   Page 19 of 20

extent that Plaintiff's motion seeks an immediate award of benefits, the undersigned **RECOMMENDS** that it be **DENIED**.

/s/ Joe L. Webster
Joe L. Webster
United States Magistrate Judge

July 23, 2015
Durham, North Carolina